·HOLTON et al. v. CITY OF ·CAMILLA· et al. '

The act of the General Assembly (Acts 1907,.p. 505.) chartering the City of Camilla, provided in the 28th paragraph of section 21 that the city should have the power "To acquire by purchase or otherwise, own, and equip ice-plants and cold-storage plants, in connection with waterworks system of said city or otherwise, and to do and perform all acts in connection with ownership and operation of and conduct of same, ordinarily incident to the operation and conduct of the same, and to issue bonds of said city, for the purpose of acquiring, owning, and equipping or operating said plants." An ordinance passed by the municipal authorities, calling an election for the purpose of having determined the question whether or not bonds of the municipality should be issued, provided: "said bonds to be issued for the purpose of procuring the sum of $12,000.00, which sum is to be used as follows: The same to be used in acquiring, equipping, enlarging, and repairing the electric and waterworks plant and system, and acquiring additional real estate upon which to locate and operate said plant; and in acquiring, establishing, equipping, and operating an ice plant in connection with the waterworks and electric lights and other public utilities of the City of Camilla." Held:

1. The operation of an ice plant by the municipal authorities of the City of Camilla, in connection with the electric-light and waterworks plant, for the purpose of furnishing ice to the inhabitants of the city, is not in violation of par. 2, sec. 1, art. 1, or of par. 3, sec. 1, art. 1, or of par. 25, sec. 1, art. 1 of the constitution of this State, or otherwise illegal; and the issuance of bonds by such municipality to raise money to establish and operate such ice plant was not illegal where the assent of two thirds of the qualified voters of the city had been obtained at an election held for the purpose of determining whether or not such bonds should be issued.

2. After a judgment was rendered confirming and validating the issuance of the bonds in proceedings had under the validation act of 1897 (Acts 1897, p. 82), citizens and taxpayers of the municipality could not for the first time attack the judgment on the ground that the money to be raised from a sale of the bonds was to be used for different purposes, and "neither said ordinance, nor the published notice of the election published in pursuance thereof, provided or gave the voters of said city any opportunity to vote for or against the bonds for each of said specified purposes separately; and hence said ordinance and said notice did not call and give notice of respectively as to each of said debts and purposes of an election 'for that purpose,' as required by the constitution of the State of Georgia, embodied in Code sec. 5893." '

3. Upon a review of the case of Lippitt v. Albany, 131 Ga. 629 (63 S. E. 33), the rulings therein made are reaffirmed.

JUNE 14, 1910. ,

Petition for injunction. Before Judge Park. Mitchell superior court. March 11, 1910.

The plaintiffs in error, as citizens and taxpayers of the City of

Camilla, filed their equitable petition against the city and its mayor, and aldermen, to enjoin the issuance and sale of certain bonds which had been authorized to be issued at an election held for that purpose. A judgment confirming and validating the issuance of the bonds had previously been rendered in proceedings had under the act of 1897 (Acts 1897, p. 82). In the equitable petition for an injunction the plaintiffs attacked the constitutionality of this act. They further contended that the judgment validating the bonds was illegal for various reasons, even if the act of 1897 was constitutional. To the order of the court refusing an interlocutory injunction, the plaintiffs excepted.

The ordinance calling the election for the purpose of having determined the question whether or not bonds should be issued provided: "said bonds to be issued for the purpose of procuring the sum of $12,000.00, which sum is to be used as follows: The same to be used in acquiring, equipping, enlarging, and repairing the electric and waterworks plant and system, and acquiring additional real estate upon which to locate and operate said plant; and in acquiring, establishing, equipping, and operating an ice plant in connection with the waterworks and electric lights and other public utilities of the City of Camilla." One of the grounds upon which the plaintiffs sought to enjoin the issuance and sale of the bonds was that the city could not engage in the enterprise of operating an ice plant. The defendants contended that the city had such power under the act of the General Assembly approved August 27, 1907 (Acts 1907, p. 505), by the provision of par. 28 of sec. 21, appearing on page 512; that in this paragraph and section of the city's charter the legislature expressly gave it authority to engage in the business of operating an ice plant and to levy a tax for that purpose; and that the act giving this authority was constitutional and valid, especially as the city was only undertaking to operate an ice plant in connection with the plant operating its waterworks and electric-light system, and merely as an incident thereto, and not as an independent business. This ground on which an injunction was sought against the issuance and sale of the bonds is more elaborately set out in the petition, as follows: "Because one of the purposes for which said bonds are to be issued is 'to acquire, establish, equip, and enlarge an ice plant in connection with the' waterworks and electric-light plant and sys-

tem and other public utilities of the City of Camilla; and such
purpose is illegal, for the reason that the said city has no right to
embark in a purely private and commercial business of manufac-
turing or dealing in a common commodity of commerce, such as
ice; and therefore the use of public funds raised by taxation for
that purpose will be illegal, and it does not appear how much of
the proceeds of said bonds shall be used for that illegal purpose
and how much for other purposes which might be legal; and there-
fore the whole issue will be illegal, as said purposes are inextricably
commingled and confused; petitioners contending that subsection
28 of section 21 of the new charter of Camilla, embraced in the
Acts of 1906, page 505, et seq., said subsection purporting to
authorize said city to purchase or otherwise own and equip an ice
plant and cold-storage plants, etc., is unconstitutional and void, be-
cause in contravention of paragraph 2, section one, article one of
the constitution of Georgia (Code section 5699), because by said
paragraph the right of private property and the paramount duty
of the government to impartially and completely protect the same
are recognized and guaranteed, and the right to apply public funds,
raised by taxation, to the carrying on of an ordinary business of
manufacturing and dealing in an ordinary commodity of com-
merce in connection with the right of eminent domain need not be
exercised,—a business in no wise in the nature of a public utility,
—is inconsistent with the complete and impartial protection of
private property, inasmuch as such right to raise by taxation, and
so apply public funds, could be applied, not only to the purposes of
government, and to matters properly coming into the scope of
public affairs, but also to every private business and every business
of every nature, and thereby the government could take upon it-
self the conduct and control of all manufacturing, commercial, and
other private businesses, and the form of government would be
transformed from its present basis of individual ownership of
property to the socialistic basis wherein private property could not
exist; and said subsection of said charter of said city is also un-
constitutional as being in contravention of paragraph 3, section 1,
article 1 of the constitution of Georgia (Code section 5700), inas-
much as its effect is to permit a citizen to be deprived of his
property other than by due process of law, to wit, by taking such
property under the guise of taxation and applying the same to the

carrying on of a, common private manufacturing and commercial enterprise wholly unrelated to any governmental purpose; and said subsection of said charter is in contravention of paragraph 25, section 1, article 1 of the constitution of said State [Civil Code, § 5722], inasmuch as its effect is to deprive citizens of the United States resident in Georgia of the full enjoyment of the rights, privileges, and immunities due to such citizenship, and especially the right of private property existing under the republican form of government established by the constitution of the United States, with the right of private property as one of its basic and fundamental features; and said subsection of said charter is in contravention of other provisions of the constitution of Georgia and of the United States."

The defendants in their answer set up, among other allegations, the following: "That it is not intended that said money shall be used simply to embark the city in a purely private and commercial business of manufacturing and dealing in ice, independent of said city's other businesses, but said city has already established and in operation a waterworks and electric-light plant, operated by steam power; and that by reason of the large power generated in said plants, and the large amount of water constantly distilled in the boilers of said steam plant, it will be profitable to said city to operate, not as an independent enterprise, but solely in connection with, and as an incident to, the operation of said electric-lights and waterworks plant, an ice machine and plant, for the reason that much of the labor and machinery necessary for the operation of such ice plant are already owned by said city in the operation of its electric light and waterworks plant, and must necessarily be continued by said city in the operation of said electric-light and waterworks plant, and said ice plant could be operated largely with the same labor already used in the waterworks and electric-light plants, the same labor being able to attend to said ice plant between the intervals of its employment in said electric-light and waterworks plant, and said operation of said ice plant will require only a small additional expense in the form of labor and machinery —not more than one half of what the expense of labor and machinery would cost to operate an ice plant independently; and therefore said city is in a position peculiarly advantageous for operating said ice plant in connection with its said waterworks and

electric-light plants, at a much less expense than such ice plant could be operated by any one else and independent of such plants as said city's waterworks and electric-light plants; and said city proposes to operate said ice plant solely as an incident to its said waterworks and electric-light plants and at a small additional expense and with large profits to said city and its taxpayers.    In addition to the foregoing, these defendants say that in the hot climate in which said city is located ice is, for several months in each year, almost a necessity for persons who use the water from the pipes of said city's waterworks system, they being a great majority of the citizens of said city; and a great deal of ice has to be used by the said citizens in the water and other beverages which they drink; and it is highly important that such citizens use ice that is free from disease producing germs, and there is danger to the citizens of said city in using ice manufactured outside of said city, by private individuals, free from any inspection by the public, in that such ice may be made of water not properly purified, and may contain dangerous disease germs; whereas the ice proposed to be manufactured by the City of Camilla in connection with its said electric-light and waterworks plant will be carefully manufactured, under public inspection and proper and sanitary rules, and it will tend to preserve the health of the citizens of said city for the ice used by them in connection with said city's waterworks system to be thus manufactured under public supervision in a proper sanitary manner."    The judgment validating and confirming the issuance of the bonds showed on its face the purpose for which the election was held and the bonds were to be issued.

*Pope & Bennet* for plaintiffs.   *M. C. Bennet,* for defendants.

HOLDEN, J.   (After stating the foregoing facts.)

1.  One of the grounds upon which the plaintiffs sought to enjoin the issuance and sale of bonds of the municipality was, that one of the purposes for which the money arising from the sale was to be used was the establishment and operation of an ice plant, which plaintiffs contended would be illegal, for reasons set forth in the preceding statement of facts.    In 1 Cooley on Taxation, 217, the author says: "The propriety and necessity of provision by taxation for a supply of water for the extinguishment of fires, and for the general use of the inhabitants of large towns, is not disputed. . . . Cities may also be authorized to construct gas-

works in order to furnish their citizens with light as well as to supply the corporate needs." And in 10 Am. & Eng. Enc. Law (2d ed.), 865, it is said: "It is generally agreed that the legislature has the power to authorize a municipality to own and operate an electric-light plant which shall furnish not only the lights needed by the municipality for lighting the streets and public places, but lights to the inhabitants for their private purposes." There are decisions of many courts to the effect that municipal corporations have the right to furnish to their inhabitants in their homes and places of business water and electric lights. In Pond on Municipal Control of Public Utilities, 28, it is said: "The courts are of the opinion that it is not only within the power of the cities but that it is their duty to keep themselves free to accept for their own use and to provide for their inhabitants new inventions and superior agencies as they arise, and that cities are not to be restricted to the providing for the strict necessities of their citizens, but that they may also minister to their comfort and pleasure." In Hequembourg v. City of Dunkirk, 49 Hun, 550, 555 (2 N. Y. Supp. 447), the court stated: "What is or what is not a municipal purpose is, in many cases, doubtful and uncertain, and it is the duty of the courts in such cases to give weight to the legislative determination, and not to annul its acts, unless it clearly appears that the act was not authorized. . . Light in dwellings is as important and essential as upon the streets, and promotes the general comfort, safety, and welfare of the inhabitants; and when it is supplied in connection with that which is furnished by the municipality, under its duty to the public, we think it may be regarded as an incident thereto, and one of the purposes for which the municipality may properly contract." In the case of Sun Publishing Ass'n v. Mayor, 8 App. Div. (N. Y.), 230, 238 (40 N. Y. Supp. 607), affirmed, 152 N. Y. 257 (46 N. E. 499, 37 L. R. A. 788), the court employed the following language: "The true test is that which requires that the work shall be essentially public and for the general good of all the inhabitants of the city. It must not be undertaken merely for gain or for private objects. Gain or loss may incidentally follow, but the purpose must be primarily to satisfy the need or contribute to the convenience of the people of the city at large. Within that sphere of action, novelty should impose no veto. Should some inventive genius bye

and bye create a system for supplying us with pure air, will the
representatives of the people be powerless to utilize it in the great
cities of the State, however extreme the want and dangerous the
delay? Will it then be said that pure air is not so important as
pure water and clear light? We apprehend not." In the case of
State ex rel. *v.* City of Toledo, 48 Ohio St. 112, 134-140 (26 N. E.
1061, 11 L. R. A. 729), the court said: "Taxation implies an im-
position for a public use. . . But, what are public purposes
is a question that must be left to the legislature, to be decided upon
its own judgment and discretion. . . Water, light, and heat
are objects of prime necessity. Their use is general and universal.
It is now well settled, that the legislature in the exercise of its
constitutional power may authorize cities to appropriate real
estate for waterworks. . . What we have said in reference
to waterworks is for the most part applicable to the erecting
and maintaining of natural or artificial gas works. . . Heat
being an agent or principle indispensable to the health, comfort,
and convenience of every inhabitant of our cities, we do not see
why through the medium of natural gas it may not be as much a
public service to furnish it to the citizens as to furnish water.
. . It is sufficient if every inhabitant who is so situated that
he can use it has the same right to use it as the other inhabitants.
. . The establishment of natural gas works by municipal cor-
porations, with the imposition of taxes to pay the cost thereof, may
be a new object of municipal policy. But in deciding whether,
in a given case, the object for which taxes are assessed is a public
or a private purpose, we can not leave out of view the progress of
society, the change of manners and customs, and the development
and growth of new wants, natural and artificial, which may from
time to time call for a new exercise of legislative power. And,
in deciding whether such taxes shall be levied for the new pur-
poses that have arisen, we should not, we think, be bound by an
inexorable rule that would embrace only those objects for which
taxes have been customarily and by long course of legislation
levied." In this connection see Gray on Limitations on Taxing
Power and Public Indebtedness, §§ 173, 176, 177, 178. If a city
has the right to furnish heat to its inhabitants because conducive
to their health, comfort, and convenience, we see no reason why
they should not be permitted to furnish ice. The object in bring-

ing, by means of a waterworks system, water in pipes from a dis-
tance for use in supplying the needs of a city is not alone to ob-
tain a sufficient quantity, but also to secure that which is freer
from impurities than it is possible to obtain in the city itself. If,
in the hot season of the year, the inhabitant of the city must, for
sanitary reasons, relinquish the cool draught from the well be-
cause, as has been demonstrated, wells of pure water can not be
maintained in populous communities, surely the city would have
the right, were it practicable, to cool the water which it delivers
through pipes as a substitute, and which ofttimes is scarcely drink-
able in its heated condition. If not practicable to cool it in the
pipes, and if it be necessary to the welfare, comfort, and con-
venience of the inhabitants that its temperature be lowered before
being used for drinking purposes, why can not the city provide for
the delivery of a part of it in a frozen condition to be used in
cooling such part of the balance as is used for drinking purposes?
Is the difference between water in a liquid and in a frozen condi-
tion a radical one? Upon what principle could the doctrine rest
that liquid water may be delivered by the city to its inhabitants
by flowage through pipes, but that water in frozen blocks can not
be delivered by wagons or otherwise? If the city has the right
to furnish its inhabitants with water in a liquid form, we fail to
see any reason why it can not furnish it to them in a frozen condi-
tion. The answer of the defendant, which was introduced in evi-
dence and considered upon the trial, states that in the hot climate
in which the City of Camilla is situated ice is necessary for the
comfort, health, and convenience of its inhabitants. If this is
true, why should not the city be permitted to furnish ice to its in-
habitants; and if the furnishing of ice to its inhabitants is con-
ducive generally to their health, comfort, and convenience, it is
certainly being furnished for a municipal or public purpose. It is
a well-known fact that one of the main uses to which ice is put is
the cooling of water for drinking purposes; and when it is used for
this purpose, if impure, it is as apt to be deleterious to the con-
sumer as any other impure water. Why, then, in the exercise of
its police power, may not a city guard against impurities in the
ice, as well as the water, used by its inhabitants? Nor do we see
any rational objection on the idea that the city will be engaging
in a manufacturing enterprise. The city might perhaps equally

as well be said to be manufacturing when by the use of a filtering process it changes impure water into that which is pure. When, in connection with its waterworks system, it produces ice, it merely, by certain processes, changes the form and temperature of a part of the water supplied by that system. We do not think the operation by the City of Camilla of an ice plant in connection with its waterworks system, for the purpose of furnishing ice to its inhabitants, is in violation of the sections of the constitution referred to in the plaintiff's petition, or that it is illegal for any reason.

2. The ordinance calling the election, and in pursuance of which it was held to determine whether or not bonds should be issued, provided: "said bonds to be issued for the purpose of procuring the sum of $12,000.00, which sum is to be used as follows: The same to be used in acquiring, equipping, enlarging, and repairing the electric and waterworks plant and system, and acquiring additional real estate upon which to locate and operate said plant; and in acquiring, establishing, equipping, and operating an ice plant in connection with the waterworks and electric lights and other public utilities of the City of Camilla." One of the grounds upon which an injunction was sought states, "each of said purposes being entirely separate, foreign, and distinct from the others, and neither said ordinance, nor the published notice of the election published in pursuance thereof (a copy of which is hereto attached, marked 'Exhibit B'), provided or gave the voters of said city any opportunity to vote for or against the bonds for each of said specified purposes separately; and hence said ordinance and said notice did not call and give notice of respectively as to each of said debts and purposes of an election 'for that purpose,' as required by the constitution of the State of Georgia, embodied in Code Sec. 5893; and said ordinance, and the notice of this election published in pursuance thereof, were and are each illegal and void, for the reason that neither of them permitted the voters to express their opinion on each of said questions as to authorizing and incurring of each of said debts separately, but required the voters by one ballot to express their opinion upon all separate and distinct questions at once, precluding the voters from voting on each of said questions submitted to them, so that they might pass upon each freely and untrammelled by any other consideration as to each of said debts than the question as to whether said debt should be in-

curred for the separate purpose named and, as to each of said debts and purposes, so combined and mingled with the question of assent thereto with other questions wholly foreign to the same, as to make the whole illegal." In *Rea* v. *LaFayette*, 130 *Ga.* 771 (61 S. E. 707), it was ruled: "Where several distinct and independent propositions for the issuing of bonds by a municipality are submitted to the qualified voters of a town or city, provision should be made in the submission for a separate vote upon each. They can not be lawfully combined and submitted to the voters as a single question." In that case the election was held under a municipal ordinance providing that the election was to be held "to determine the question whether said city will issue bonds in the aggregate sum of forty thousand dollars, . . said sum to be expended as follows, to wit: For the purpose of establishing and maintaining a system of waterworks, twenty-five thousand dollars. For the purpose of establishing and maintaining a system of electric lights, ten thousand dollars. For the purpose of extending and improving the public school of said city, and providing adequate accommodations for school patrons and children of said city, five thousand dollars." The questions ruled upon in that case were made by the plaintiffs at the hearing in the proceedings to validate the bonds had under the validation act of 1897. It appears from the record in the case of *Lippitt* v. *Albany*, 131 *Ga.* 629 (63 S. E. 33), that this identical question was raised in that case, where an injunction was sought against the issuance of the bonds under the judgment of the court validating them; and it was there held that objections of this character to the issuance and sale of bonds could not be raised after a judgment validating and confirming them was had under the act of 1897, and the judgment of the court below refusing an interlocutory injunction was by this court affirmed. In the case of *Cain* v. *Smith*, 117 *Ga.* 902 (44 S. E. 5), there was under consideration an act of the legislature providing for the submission to the voters of two questions; one was whether or not they would adopt a charter for the town; the other, whether they would incur a debt for the purpose of purchasing sites and erecting schoolhouses thereon. It was held that under the provisions of the constitution hereinbefore referred to, embodied in the Civil Code, § 5893, the act was void. It was there held that the constitutional provision above referred to contemplated that the question as to whether or not a debt should

be incurred for a particular purpose should not be submitted to the voters in such a way that they could not vote for or against it without voting for or against another separate and distinct proposition foreign to the question as to whether or not they would incur a debt for a specified purpose.    The ordinance under which the election was called in the case which we are considering did not provide that the voters should pass upon any question except the one of incurring a debt for a specified amount.    It is true that the ordinance provided that the money raised from the issuance of the bonds was to be used in connection with the electric-light and waterworks plant and system, and in establishing, maintaining, and operating an ice plant in connection therewith and other public utilities of the city; but there was no question submitted to the voters except that of incurring a bonded debt in one specified amount for this purpose.    There was no effort to provide for an issue of bonds except for one fixed sum, though the money arising from the sale thereof was to be used for the purposes above stated —the amount to be used in connection with the electric-light and waterworks system and the amount to be used in connection with the ice plant not being specified.    The electric-light and waterworks system appears to be operated from one power-house by steam, and as one plant, and the manufactory for ice is to be operated in connection with and as a part of the waterworks plant. Whether the mode of having the question in regard to the issue of bonds voted upon was a proper one was one of the questions to be determined upon the hearing before the court as to whether or not the bonds should be validated.    Jurisdiction of the subject-matter of validating bonds was conferred on the court by the general validating act of 1897.    The court having jurisdiction of such subject-matter under this general act had power to determine, on proper proceedings, whether a given municipality seeking to issue bonds had complied with all of the prerequisites for that purpose. Included among the matters which it could determine was whether or not the proper method of submitting to the voters the question as to whether or not the bonds would be issued had been pursued. Such a matter does not affect the jurisdiction of the court over the subject of validating bonds, and this was a question to be determined by the court, in the exercise of that jurisdiction, upon the hearing on the question of validation.    Even if the method pro-

vided for having the question of whether or not bonds should be issued voted upon was an irregular and an improper method, we do not think the plaintiffs could take advantage of this, after the judgment of validation was rendered in proper proceedings under the act of 1897, by injunction proceedings to prevent their issuance and sale. See, in this connection, *Baker* v. *Cartersville*, 127 *Ga.* 221 (56 S. E. 249). If after a hearing has been accorded to persons interested, and a formal judgment confirming an issue of bonds has been obtained pursuant to the provisions of the act, questions of this kind were permitted to be raised, the main purpose of the act would be defeated.

3. There were grounds other than those hereinbefore specially named, upon which an injunction was sought. Some of them involved attacks upon the constitutionality of the validation act of 1897; others involved attacks on the judgment by which the bonds were declared validated, and on the regularity of the proceedings upon which such judgment was based. These attacks are set forth at length in the record; but we deem it unprofitable to here repeat them, as all of the questions there made are controlled by former adjudications of this court. We are asked to review and overrule the decision in the case of *Lippitt* v. *Albany,* supra; but after careful consideration we decline to do so. The court committed no error in refusing the interlocutory injunction.

*Judgment affirmed.　All the Justices concur.*