MILLER *et al. v.* HEAD *et al.*

No. 12556. September 21, 1938.

*Blair & Gardner,* for plaintiffs.

*Carmichael & Grove* and *Little, Powell, Reid & Goldstein,* for defendants.

BELL, Justice. The exception is to a judgment denying an interlocutory injunction. J. R. Miller, Charles M. Brown, and Thomas E. Latimer, citizens and taxpayers of Cobb County, filed a suit against C. M. Head as commissioner of roads and revenues of the county, and H. P. Carpenter and J. J. Daniell, constituting the advisory board "to serve and act in conjunction with the said commissioner" (Ga. L. 1924, pp. 314, 319), seeking an injunction to restrain further action by the defendants under a resolution adopted by the commissioner and the advisory board, in which it was proposed in behalf of the county to construct and maintain a waterworks system in a described area, in pursuance of the act of the General Assembly approved March 31, 1937, known as the revenue-certificate law. The defendants filed a general demurrer and an answer. At an interlocutory hearing, the case was submitted to the judge on the pleadings. He did not expressly rule on the demurrer, but appears to have considered it in reaching his conclusion, there being no issue of fact involved. He passed an order denying an interlocutory injunction, and the plaintiffs excepted.

The revenue-certificate law (Ga. L. 1937, p. 761) is entitled, "An act authorizing counties, cities, and towns to acquire, construct, reconstruct, improve, better, and extend revenue-producing undertakings; to maintain and operate the same; to prescribe, revise, and collect rates, fees, tolls, and charges for the services, facilities, and commodities furnished thereby, and, in anticipation of the collection of the revenues thereof, to issue negotiable certificates payable solely from such revenues; regulating the issuance of such certificates, and providing for their payment and for the rights of the holders thereof; and for other purposes." In section 2 it is declared that the word "municipality" as contained in the act shall mean any county, city, or town of this State. The

general purpose of the act is to provide for the establishment of self-liquidating undertakings by counties and municipalities. In section 2 the term "undertaking" is defined as embracing a number of stated projects, including "systems, plants, works, instrumentalities, and properties . . used or useful in connection with the obtaining of a water supply and the conservation, treatment, and disposal of water for public and private uses . . ; together with all parts of any such undertaking and all appurtenances thereto, including lands, easements, rights in land, water rights, contract rights, franchises, approaches, dams, reservoirs, generating stations, sewage-disposal plants, intercepting sewers, trunk, connecting and other sewer and water mains, filtration works, pumping stations, and equipment." Section 3 provides that any municipality shall have the power under this act to acquire by purchase, gift, or condemnation, lands, easements, and water rights necessary to construct, reconstruct, improve, and extend any such undertaking wholly or partially within or without such municipality; to operate and maintain any such undertaking for its own use, and for the use of public and private consumers; to prescribe, revise, and collect fees and charges for the services, facilities, and commodities furnished by such undertaking, and, on the basis of anticipated revenue, to issue revenue-anticipation certificates to finance the undertaking, and improvements and extensions thereof, in whole or in part; to pledge to the punctual payment of said certificates and interest thereon all or any part of the revenues of such undertaking; and "to make all contracts, execute other instruments, and do all things necessary or convenient in the exercise of the powers herein granted, or in the performance of its covenants or duties, or in order to secure the payment of its certificates; Provided, no encumbrance, mortgage, or other pledge of property of the municipality is created thereby; and provided, no property of the municipality is liable to be forfeited or taken in payment of said certificates; and provided, no debt on the credit of the municipality is thereby incurred in any manner for any purpose." Section 4 provides that any such undertaking, and the issuance "of certificates to provide funds to pay the cost thereof," may be authorized by resolution or resolutions of the governing body, and that "the governing body in determining such cost may include all costs and estimated costs of the issuance of said certificates;

all engineering, inspection, fiscal, and legal expenses, and interest, which it is estimated will accrue during the construction period and for six months thereafter, on money borrowed or which it is estimated will be borrowed pursuant to this act."

Section 5 provides for determination of the terms and conditions of the revenue-anticipation certificates, subject to stated restrictions. The certificates shall be negotiable for all purposes, and non-taxable. Section 6 provides that any resolution or resolutions authorizing the issuance of certificates may contain covenants on enumerated subjects, one of the subjects being "a fair and reasonable payment by the municipality to the account of said undertaking for the services, facilities, or commodities furnished said municipality or any of its departments by said undertaking;" and still others being insurance to be carried thereon, bookkeeping and auditing, and "the continuous operation and maintenance of the undertaking." Section 6 declares: "The provisions of this act and of any such resolution or resolutions shall be a contract with every holder of said certificates; and the duties of the municipality and the governing body and the officers of the municipality under this act and under any such resolution or resolutions shall be enforceable by any certificate holder by mandamus or other appropriate suit, action, or proceeding at law or in equity."

Section 7 declares: "Revenue-anticipation certificates issued under this act shall not be payable from or charged upon any funds other than the revenue pledged to the payment thereof, nor shall the municipality issuing the same be subject to any pecuniary liability thereon. No holder or holders of any such certificate shall ever have the right to compel any exercise of the taxing power of the municipality to pay any such certificates or the interest thereon, nor to enforce payment thereof against any property of the municipality; nor shall any such certificates constitute a charge, lien, or encumbrance, legal or equitable, upon any property of the municipality. Every certificate issued under this act shall contain a recital setting forth the substance of this section."

Section 8 provides for the appointment of a receiver in the event the municipality shall default in the payment of the principal or interest on any of the revenue-anticipation certificates and the continuing of such default for the period of 30 days, or on

the failure or the refusal of the municipality to comply with the essential provisions of this act or with any agreement made in pursuance thereof. Upon proper application, the superior court may appoint such receiver if such action is deemed necessary for the protection of the bondholders, and *shall* appoint such receiver if such application is made by the holders, or by any trustee for holders, of 25% of the principal amount of such revenue-anticipation certificates then outstanding. This section also prescribes the powers and duties of the receiver, which shall include "all the rights and powers of the municipality with respect to the undertaking." The receiver, however, shall at all times be subject to the orders and decrees of the court, and may be removed thereby. Among the provisions of this section are the following: "5. Notwithstanding anything in this section to the contrary, said receiver shall have no power to sell, assign, mortgage, or otherwise dispose of any assets of whatever kind or character belonging to the municipality and useful for the undertaking, but the authority of any such receiver shall be limited to the operation and maintenance of the undertaking; and no court shall have jurisdiction to enter any order or decree requiring or permitting said receiver to sell, assign, mortgage, or otherwise dispose of any such assets. 6. If any part or portion of this section shall be held by any court of competent jurisdiction to create a debt of a municipality or to be unenforceable or ineffective, the remaining parts and portions of this section shall not be affected thereby in any way, but the part or portion so held unenforceable and ineffective shall be severed and rescinded from this act. The intention of the General Assembly not to permit any municipality to be deprived of its property or to be susceptible or liable to forfeiture shall be controlling."

Sections 9 to 18, inclusive, provide for validation of the revenue-anticipation certificates on action by the solicitor-general or the attorney-general, the procedure to be followed being stated in detail. Section 16 provides: "The cost of said case shall be paid in any event by the municipality desiring to issue said certificates; and in addition to costs it shall also pay the solicitor-general the sum of twenty-five ($25.00) dollars for his entire services in such case."

"Section 19. Construction of act. The powers conferred by

this act shall be in addition and supplemental to, and not in substitution for, and the limitations imposed by this act shall not affect the powers conferred by any other general, special, or local law. Certificates may be issued under this act without regard to the provisions of any other general, special, or local law. The General Assembly hereby declares its intention that the limitations of the amount or percentage of, and the restrictions relating to, indebtedness of a municipality and the incurring thereof, contained in the constitution of the State and in any general, special, or local law, shall not apply to certificates and the issuance thereof under this act.

"Section 20. Separability of provisions. If any provision of this act, or the application of such provision to any person, body, undertaking, or circumstance shall be held invalid, the remainder of the act and the application of such provision to persons, bodies, undertakings, or circumstances other than those as to which it shall have been held invalid shall not be affected thereby."

The plaintiffs attached to their petition a copy of a resolution alleged to have been adopted by the county authorities, a synopsis of which is as follows: The new waterworks system is to extend from the limits of the City of Marietta along State Highway No. 3 to the Chattahoochee River, designated as a congested area occupying a distance of about ten and one-half miles, and being without adequate supply of water and without fire protection, conditions which are not "conducive to the public health and general welfare of the people of the county and of said community." About 425 prospective users of water along this highway, and within reach of the proposed mains, have signified their intention to purchase water if it is made available. The county intends to proceed in pursuance of the act of March 31, 1937, in acquiring, constructing, operating, and maintaining such water system, to be known as "Cobb County Waterworks." In order to provide for the payment of the costs in excess of any grant by the United States Government, there shall be issued revenue certificates of the Cobb County Waterworks in the amount of $100,000, in denominations of $1000 each, dated July 1, 1938, and bearing interest at four per cent. per annum, payable semi-annually. These certificates and their interest coupons "shall be payable only out of 'Cobb County Waterworks Certificate and In-

terest Redemption Fund,' hereinafter created, and shall be a valid claim of the holders thereof only against such fund, and the income and revenues of the Cobb County Waterworks, pledged to such fund, including income and revenue from all future additions which may be lawfully pledged to such fund." The resolution embodied forms of the revenue certificates and of the interest coupons. According to the form of certificates for principal, the County of Cobb promises to pay to the bearer of each certificate the sum of $1000 on a specified date, together with interest at four per cent. per annum, payable semi-annually beginning on January 1, 1939, but, as qualifying this promise, each certificate will contain the following recitals and conditions:

"This certificate is payable only from a fixed amount of the gross income and revenues to be derived from the operation of said waterworks system, including all future additions thereto, the revenue from which may be lawfully pledged to such fund, which has been set aside as a special fund and irrevocably pledged for that purpose and identified as the 'Cobb County Waterworks Certificate and Interest Redemption Fund.' This certificate does not constitute an indebtedness of Cobb County, within the meaning of any constitutional provision or limitation. Neither the principal nor interest of this certificate is payable from or chargeable against any funds of Cobb County other than the revenue herein pledged for the payment thereof, nor shall said county be subject to any pecuniary liability hereon. No holder of this certificate shall ever have the right to compel any exercise of the taxing power of Cobb County to pay the same, or the interest thereon, nor to enforce payment thereof against any property of the county; nor shall this certificate constitute a charge, lien, or encumbrance, legal or equitable, upon any property of the county. This certificate is entitled to priority of payment as to principal and interest, according to its tenor, from the 'Cobb County Waterworks Certificate and Interest Redemption Fund,' as against any such certificates which may be hereafter issued by Cobb County for funds for extending or adding to said waterworks system." Each certificate provides that in case of default the certificate-holders shall be entitled to the remedies provided by section 8, supra; also that this certificate is exempt from taxation in Georgia. The resolution further provided:

"4. From and after the delivery of any certificate issued under the provisions of this resolution, said waterworks system shall be operated on a fiscal-year basis, commencing on July 1st of each year and ending on June 30th of the following year, and on that basis the income and revenues of said system shall be set aside into a separate and special fund, to be used for the retirement of the aforesaid certificates, and in maintaining said system and providing a depreciation fund as follows, to wit: There shall be and there is hereby created an account to be known as the 'Cobb County Waterworks Certificate and Interest Redemption Fund' (hereinafter called the 'certificate fund') into which there shall be set aside from the gross income and revenues of the system, including all future additions thereto, the revenue from which may be lawfully pledged to said fund, such amount thereof as will be sufficient to pay the interest and principal of the certificates hereby authorized; and it is hereby determined that the amounts necessary and to be set aside into said fund shall be as follows: During the first ten years after the date when the system was first put into operation, the amount of the gross revenues of the system so payable into the certificate fund at the end of each month shall equal one fifth of the next maturing instalment of interest and one tenth of the next maturing instalment of principal. During each of the following years (after the first ten), the amount so payable at the end of each month to the certificate-holder shall equal one sixth of the next maturing instalment of interest and one twelfth of the next maturing instalment of principal on the certificate. In the event that the gross revenues in any month shall be insufficient to make the aforesaid payments in full, any such deficiency shall be added to the amounts required to be paid into such certificate fund from the first gross revenues of the system thereafter received. The amount by which any such payment in any fiscal year exceeds the aggregate amount of interest on and principal of said certificates becoming due in the year, shall be held in said certificate fund as a reserve for contingencies and used solely as herein provided. Provided, however, that no further payments need be made into said certificate fund after such amount of bonds shall have been retired; that the amount then held in such fund, including the reserve for contingencies, is equal to the entire amount of the principal and interest that

will be payable at the time of their maturity on all of the certificates then remaining outstanding. If, for any reason, there shall be a failure to make any such payments into such certificate fund as aforesaid, during any fiscal year, any sums then held as a reserve for contingencies shall be used for the payment of any portion of the interest on or principal of said certificates becoming due in such fiscal year, on which certificates there would otherwise be default, but such reserve shall be reimbursed therefor from the first available payments made into the certificate fund in the following year or years in excess of the required payment for the then current fiscal year. All moneys held in the certificate fund or as a reserve for contingencies shall be deposited in a bank which is a member of the Federal Reserve System, or a bank which is a member of the National Deposit Insurance Corporation; but the moneys held as a reserve for contingencies may be invested in direct obligations ·of the United States Government; provided, however, that the commissioner or his successor, by whatever name called, shall make sale of a sufficient amount of such obligations in the event that it shall prove necessary to draw upon said reserve for contingency. The payments hereinabove provided shall be made into said certificate fund in equal monthly instalments on the first day of each month, except when the first day of any month shall be on Sunday or legal holiday, and then such payments shall be made on the next succeeding secular day, and the balance then remaining shall be set aside for operation, maintenance, and depreciation as hereinafter provided. The certificate fund hereinabove created and described shall be used solely and only for the purpose of paying the principal of and interest on the bonds herein authorized to be issued, and is hereby irrevocably pledged for that purpose, and shall be used for no other purpose whatsoever. Ninety per cent. of the balance of the income and revenues remaining after the aforesaid payments into the certificate fund shall be set aside in an 'Operation and Maintenance Fund,' and used for the proper operation and maintenance of said system, the Commissioner and the Advisory Board hereby finding and determining that said 90 % of such balance of the revenues of said system is necessary for the proper operation and maintenance thereof, but not in excess of the amount required for said purpose. Ten per cent. of such balance of the income and revenues of said

system shall be set aside in a 'Depreciation Fund,' and shall be expended in making good any depreciation in said system and in making any extensions, additions, or constructions to the property, the Commissioner and the Advisory Board hereby finding and determining that such proportion of said balance of the income and revenues is sufficient for said purpose. Any accumulations in such depreciation fund may be invested as the Commissioner and the Advisory Board, or their successors in office by whatever name called, may designate, and, if invested, the income from the investments shall be carried in the depreciation fund, and said fund and the proceeds thereof shall not be used for any purpose other than as herein provided.

"5. All moneys received from any certificates issued pursuant hereto, exclusive of accrued interest, shall be applied solely for the construction of said system as herein authorized; provided that such proceeds, together with all sums received as accrued interest, of said certificates, shall be used also to pay interest on said certificates during the period of construction of the system.

"6. While the certificates authorized hereunder or any of them remain outstanding and unpaid, the rates for all services rendered by the said system to the county and to its citizens, corporations, or other consumers, shall be reasonable and just, taking into account and consideration the cost of maintaining and operating the same, the proper and necessary allowance for depreciation thereof, the amounts necessary for the retirement of all certificates and the accruing interest on all such certificates as may be sold and are unpaid under the provisions of this resolution; and there shall be charged against all users of said system, including the county, or any other political subdivision of the State or county, such rates and amounts for water service or other services rendered as shall be adequate to meet the requirements of this and the preceding sections hereof. Compensation for services rendered to the county or other political subdivisions of the State or county shall, in like manner, be paid monthly as same accrue, and paid into the special funds created by this resolution, and apportioned as herein provided, as other income and revenues of said system are apportioned.

"7. The county hereby covenants and agrees with the holder or holders of the certificates herein authorized to be issued, or of

any of them, that the county and its governing body and officers, agents, and employees will faithfully and punctually perform all duties with reference to said system required by the constitution and laws of the State of Georgia, including the making and collecting of reasonable and sufficient rates for services rendered by said system, and will segregate the revenue of said system and the application of the respective funds created by this resolution; and the county hereby irrevocably covenants, binds and obligates itself not to sell, lease, mortgage or encumber, or in any manner dispose of said waterworks system or any extension or addition thereto made or constructed from the depreciation fund herein provided for until all the certificates herein authorized to be issued shall have been paid in full, both principal and interest; and the county further covenants and agrees with the holders of said certificates to maintain in good condition and continuously operate said system, and to charge and collect such rates and charges for services rendered thereby as that the gross revenues will be sufficient at all times to provide for the payment of the operation and maintenance thereof and maintain a depreciation fund and certificate fund as provided herein: Provided, however, that nothing contained in this section or elsewhere in said resolution shall be construed to subject the county to any liability to be discharged from any fund or property of the county other than the revenue derived from said waterworks system, nor otherwise to subject the county to any pecuniary liability, or to authorize or permit any exercise of the taxing power of the county or to impose or constitute any charge, lien, or encumbrance, legal or equitable, upon any property of the county. . .

"11. So long as any of said certificates are outstanding, the county shall (a) maintain insurance for 'the benefit of the holders of the certificates herein authorized, of a kind and in an amount which usually would be carried by private companies engaged in a similar type of business, and pay the cost of such insurance from the operation and maintenance fund herein described; provided that the cost of such insurance shall be payable exclusively from said operation and maintenance fund, and shall not be paid or payable from any other fund or property of the county, derived from taxation or otherwise; (b) keep proper books of record and account (separate from all other records and accounts), in which

complete and correct entries shall be made of all transactions relating to said system. The county shall furnish to the original purchaser of said bonds (and to any holder of any of said bonds at the written request of said holder), not more than thirty days after the close of each six months fiscal period, complete operating and income statements of the said system in reasonable detail, covering such six months period, and, not more than sixty days after the close of such fiscal year, complete financial statements of the said system in reasonable detail covering such fiscal year, as certified by the county's auditor; and (c) grant to any holder or holders of 25 % of said certificates then outstanding the right at all reasonable times to inspect the system and all records, accounts, and data of the county, relating thereto; provided that the cost and expense of furnishing the information provided for by this section and of keeping the books, records, and accounts required by this section to be kept shall be paid and payable exclusively from said operation and maintenance fund, and shall not be paid or payable from any other fund or property of the county, derived from taxation or otherwise.

"12. Upon the validation of the certificates herein provided for by appropriate final order of the superior court of Cobb County, the certificates, with the appropriate interest coupons, shall be executed and issued as herein provided in the form prescribed by this resolution, and shall be sold by the Commissioner for cash at not less than par and accrued interest, if any, after such advertisement and notice as the Commissioner shall deem proper. The entire proceeds derived from the sale shall be applied first to the costs and expenses of the issuance of the certificates, including necessary legal expenses, and the balance to the expense of acquiring and constructing the undertaking, including the cost of all materials and supplies, of easements and rights of way, of engineering and inspection, and all other costs of construction.

"13. If any section, paragraph, clause, or provision of this resolution shall be held invalid, the invalidity of such section, paragraph, clause, or provision shall not affect any of the remaining provisions of this resolution.

"14. All resolutions and orders or parts thereof heretofore passed or adopted by the Commissioner and the Advisory Board,

which are in conflict with the provisions of this resolution, to the extent of such conflict, are hereby revoked and annulled.

"15. Notice of the adoption of this resolution and a copy hereof shall be served upon the solicitor-general of the Blue Ridge Circuit, as provided by section 10 of said act of March 31, 1937, or upon the attorney-general of Georgia if the solicitor-general be absent from his circuit, in order that a proceeding for the confirmation and validation of said certificates by the superior court of Cobb County, as required by said act of March 31, 1937, may be instituted by said solicitor-general or attorney-general."

The foregoing resolution was adopted on August 5, 1938. The petition assailed the revenue-certificate act as unconstitutional and void, for the following reasons: It is contrary to art. 7, sec. 7, par. 1, of the constitution of Georgia (Code, § 2-5501), limiting the amount of debts of counties, municipalities, and other political divisions, and providing that no such county, municipality, or political division "shall incur any new debt except for a temporary loan or loans, to supply casual deficiencies of revenue, not to exceed one fifth of one per centum of the assessed value of the taxable property therein, without the assent of two thirds of the qualified voters thereof, voting at an election for that purpose to be held as prescribed by law," in that "(a) said act provides for the issuance and sale of revenue certificates payable solely from revenues derived from undertakings constructed with the proceeds of the sale of such certificates, without the assent of two thirds of the qualified voters of the county or municipality, as required by the constitution, and permits debts to be created against a county or municipality without compliance with the stated constitutional provisions; (b) said act permits the issuance and sale of such revenue certificates for purposes other than temporary loans to supply casual deficiencies of revenue, without the assent of two thirds of the qualified voters as provided by the constitution; (c) said act permits the issuance and sale of revenue certificates in an amount exceeding one fifth of one per centum of the assessed value of the taxable property of any such county or municipality, without the consent of two thirds of the qualified voters thereof, as required by the constitution." The act is contrary also to art. 1, sec. 1, par. 2, of the constitution (Code, § 2-102), declaring that "Protection to person and prop-

erty is the paramount duty of government, and shall be impartial and complete," in that "it authorizes and empowers the counties of this State and authorizes and empowers Cobb County to engage in the distribution and sale of water, which is not an essential governmental function or necessary to the protection of person or property." The entire act being, as the plaintiffs contend, unconstitutional and void for the reasons stated, the portions of it relating to validation of the revenue certificates and providing for the payment of the entire cost of such proceeding in any event, including the fee of the solicitor-general in the sum of $25, is invalid, and confers no authority upon the county and its officials to use the public funds for the payment of such costs; but the defendants will proceed to pay the same, unless restrained and enjoined from going forward with such proceeding. The plaintiffs not only brought into question the validity of the revenue-certificate act, as indicated, but they also assailed the resolution as adopted by the county commissioner and the advisory board, on several grounds. The grounds of their attack upon the resolution were, however, substantially the same as those urged against the statute, except that with respect to the resolution the following additional contentions were made: (1) "The defendant commissioner and the members of the advisory board have no power or authority to borrow money for the purposes or in the manner specified in said resolution or otherwise, or to issue the proposed certificates, or to do any of the other things required and provided for by said resolution." (2) "The proposed action of the defendants is illegal and contrary to the constitution and laws of this State, for the further reason that the county is without authority of law to enter upon the business of selling and distributing water, as contemplated and provided for by said resolution, and is without authority of law to construct, maintain, and operate a system of waterworks as contemplated and provided for by said resolution." (3) "Said resolution provides that the commissioner shall make and fix reasonable and sufficient rates for service rendered by said system, and collect therefor, which the commissioner of roads and revenues of said county is without authority of law to do; and for this reason the proposed action of the defendants is illegal." (4) "The proposed action of the defendants is illegal, for the reason that the county is without

authority of law to do any of the things contemplated by said resolution, and the commissioner of roads and revenues of said county is without authority of law to do any of the things contemplated by said resolution."

As shown in the foregoing statement, this case involves the validity of the revenue-certificate act of March 31, 1937. It should be observed, however, that the plaintiffs have assailed the statute as a whole for reasons stated, and have not challenged any particular part of it upon any ground. Accordingly, with respect to this phase of the case, we shall consider only the general question whether the act is invalid as a whole for any of the reasons urged, without adjudication as to any particular sections or parts of it, except as related to the general question. Cf. *Atlantic Loan Co.* v. *Peterson,* 181 *Ga.* 266 (182 S. E. 15). This statement, however, is not to be taken as an intimation that other separate portions may or may not be unconstitutional. It is simply an effort to clarify the case and to indicate the scope of our decision. Furthermore, since no person will be heard to question the validity of an act of the General Assembly except as it may affect his personal or property rights (*Plumb* v. *Christie,* 103 *Ga.* 686 (2), 30 S. E. 759, 42 L. R. A. 181; *Hazleton* v. *Atlanta,* 147 *Ga.* 207 (4), 208, 93 S. E. 202; *Morris* v. *Interstate Bond Co.,* 180 *Ga.* 689 (2), 180 S. E. 819, 100 A. L. R. 415), we are concerned here only with the validity of this statute as applied to the particular undertaking and as against the specific objections presently urged by the plaintiffs, upon their relation as citizens and taxpayers. The ultimate question, then, is whether, within the limitations stated, this statute constitutionally authorizes the undertaking as now proposed by the authorities of Cobb County.

It is insisted, first, that the act is invalid because it violates the provision of the constitution of this State (Code, § 2-5501) limiting the debts of counties, municipalities, and political divisions, and providing that no such county, municipality, or political division "shall incur any new debt except for a temporary loan or loans, to supply casual deficiencies of revenue, not to exceed one fifth of one per centum of the assessed value of the taxable property therein, without the assent of two thirds of the qualified voters thereof, voting at an election for that purpose to be held as prescribed by law." The specific contentions made in this

connection are: (1) The act provides for the issuance and sale of revenue certificates payable solely from the revenue derived from the undertaking constructed with the proceeds of the sale of such certificates, without the assent of two thirds of the qualified voters of the county or municipality, and permits the creation of debts against a county or municipality without compliance with constitutional requirements. (2) It permits the issuance and sale of such revenue certificates for purposes other than temporary loans to supply casual deficiencies in revenue, without the assent of two thirds of the qualified voters of the county or municipality, as provided by the constitution. (3) The act permits the issuance and sale of revenue certificates in an amount exceeding one fifth of one per centum of the assessed value of the taxable property of a county or municipality, without the consent of two thirds of the qualified voters thereof, as required by the constitution. All of these contentions are predicated upon the assumption that the revenue certificates will constitute a *debt* within the meaning of the foregoing provisions of the constitution of this State. We can not concur in this view. The act is designed to provide for self-liquidating projects, and the revenue certificates therein contemplated are not to be a charge against the general credit of the county or municipality. The liability is to be satisfied only from revenues produced by the undertaking, and under the specific terms of the statute the political division will never be required to aid in its retirement with funds derived from any other source, and is in fact prohibited from doing so. For application of these provisions to the particular case, let us examine the resolution as adopted by the authorities of Cobb County.

Under this resolution, the proposed system of waterworks is an entirely new undertaking, and no existing funds or property of the county can go into it for the purpose of creating a combined enterprise as basis for the production of income from which the certificates are to be retired. If the revenues produced should prove inadequate to retire the certificates with interest thereon, and to maintain the system as a going concern, the holders of the certificates and coupons will have to sustain the loss, and the system can only suffer such fate as may result to it from lack of support from the county treasury. It is provided by section 4 of the statute that the certificates are to provide funds for the purpose

of paying the cost of the acquisition, construction, reconstruction, improvement, betterment, or extension of any undertaking, and in determining such cost the governing body of the county or municipality "may include all costs and estimated costs of the issuance of said certificates, all engineering, inspection, fiscal and legal expenses, and interest, which it is estimated will accrue during the construction period, and for six months thereafter, on money borrowed or which it is estimated will be borrowed pursuant to this act." Section 7 of the act declares: "Revenue-anticipation certificates issued under this act shall not be payable from or charged upon any funds other than the revenue pledged to the payment thereof, nor shall the municipality issuing the same be subject to any pecuniary liability thereon. No holder or holders of any such certificate shall ever have the right to compel any exercise of the taxing power of the municipality to pay any such certificates or the interest thereon, nor to enforce payment thereof against any property of the municipality; nor shall any such certificates constitute a charge, lien, or encumbrance, legal or equitable, upon any property of the municipality. Every certificate issued under this act shall contain a recital setting forth the substance of this section." The resolution adopted by the county is in accord with these provisions, and the person or persons who may see fit to purchase the certificates will take them subject to the conditions thus imposed, and will have no other claim against the county. The statute provides (section 16) that the cost of the validation proceeding, including the fee of the solicitor-general, "shall be paid in any event by the municipality." But, if the act is otherwise valid, this would not be an illegal expenditure or constitute a debt within the meaning of the constitution, since under the terms of section 4 it is to be paid as "legal expenses" from the proceeds of the certificates. The statement that the cost of such proceeding shall be paid "in any event" by the municipality is construed to mean that such expense shall be paid by the county from general funds only in the event the certificates should fail of validation. Even in such case it would not be a debt within the meaning of the constitution; nor would it constitute an illegal expenditure, provided the act is not invalid as related to such proceeding. Under the constitution, expense of "litigation" is

one of the purposes for which counties may be authorized by law to levy taxes. Code, § 2-5402.

The courts of the country have generally sustained the validity of statutes calling for payments by counties or municipalities solely out of special funds, where such funds are derived from the revenues produced by an entirely new undertaking. One of the first decisions to this effect was rendered by the Supreme Court of the State of Washington, in Winston v. Spokane, 12 Wash. 524 (41 Pac. 888), decided in 1895. Since that decision many similar cases have arisen in other States, and the courts in dealing with them have generally followed the doctrine enunciated in the Winston case, although there are some decisions to the contrary. As typical of those approving the doctrine, see Oppenheim v. Florence, 229 Ala. 50 (155 So. 859); Bankhead v. Sulligent, 229 Ala. 45 (155 So. 869, 96 A. L. R. 1381); State v. Miami, 113 Fla. 280 (152 So. 6); Board of Commissioners v. Herrick, 123 Fla. 619 (167 So. 386); Robinson v. Zimmerman, 268 N. Y. 52 (196 N. E. 740). Among decisions to the contrary are the following: Feil v. Coeur d'Alene, 23 Idaho, 32 (129 Pac. 643, 43 L. R. A. (N. S.) 1095); Lesser v. Warren, 237 Pa. 501 (85 Atl. 839, 43 L. R. A. (N. S.) 839); Zachary v. Wagoner, 146 Okla. 268 (292 Pac. 345); Miller v. Buhl, 48 Idaho, 668 (284 Pac. 843, 72 A. L. R. 682). Other decisions both pro and con are listed in annotations in 72 A. L. R. 687, and 96 A. L. R. 1385. In 72 A. L. R. 688, it is stated: "According to the great weight of authority, a municipality or other political subdivision does not create an indebtedness or liability, within the meaning of a constitutional or statutory debt limitation, by purchasing property to be paid for wholly out of the income or revenue to be derived from the property purchased." In 96 A. L. R. 1385, is the following comment: "The rule stated in the original annotation on this subject, that the purchase of property by a municipality or other political subdivision, to be paid for wholly out of the income or revenue from the property purchased, without any other liability on the part of the purchaser, does not create an indebtedness within the meaning of the organic debt limitation, has been generally followed in the subsequent decisions." See, in this connection, State v. Regents of the University System, 179 Ga. 210 (1, 6) (175 S. E. 567).

Undertakings bearing some resemblance to that here under consideration were held invalid in *Byars* v. *Griffin,* 168 *Ga.* 41 (147 S. E. 66); *Dortch* v. *Southeastern Fair Association,* 182 *Ga.* 633 (186 S. E. 685); *Cartledge* v. *Augusta,* 183 *Ga.* 414 (188 S. E. 675); but the undertaking considered in each of these cases involved existing property or funds of the municipality, and did not, as here, start from scratch as an entirely new enterprise without financial aid or support from existing property or funds of the municipality. In *Morton* v. *Waycross,* 173 *Ga.* 298 (160 S. E. 330), the city agreed to purchase electrical equipment and to pay therefor $9000, with interest at five per cent., by crediting monthly on the franchise tax due by the seller, "fifty per cent. of the saving effected by the operation with electric energy." This was held an unconstitutional promise to pay, notwithstanding the special terms of the agreement. The equipment was added to and commingled with other property of the municipality, and the savings necessarily belonged to the city as a part of its general property. The payments were not to be made from a special fund arising from the revenues produced by an entirely new project, but were in essence and effect to be made from a fund raised by taxation, since they were to be credited upon a franchise tax payable by the seller. In the decision it was said: "The proposed contract differs in several respects from the contracts involved in the cases of *Renfroe* v. *Atlanta,* 140 *Ga.* 81 (78 S. E. 449, 45 L. R. A. (N. S.) 1173), and *Byars* v. *Griffin,* 168 *Ga.* 41 (147 S. E. 66), but on the point above ruled it is controlled by the principles applied in those cases." From what has been said, the present case is distinguished by its facts from the *Morton* case. For other cases involving existing property or funds of the political division, and being thus similar to the four decisions last mentioned, see Hight v. Harrisonville, 328 Mo. 549 (41 S. W. (2d) 155); City of Campbell v. Arkansas-Missouri Power Co., 55 Fed. (2d) 560; Hesse v. Watertown, 57 S. D. 325 (232 N. W. 53); City of Joliet v. Alexander, 194 Ill. 457 (62 N. E. 861); Schnell v. Rock Island, 232 Ill. 89 (83 N. E. 462, 14 L. R. A. (N. S.) 874); Garrett v. Swanton, 216 Cal. 220 (13 Pac. (2d) 725); Wilder v. Murphy, 56 N. D. 436 (218 N. W. 156); Newell v. People, 7 N. Y. 9; Leonard v. Metropolis, 278 Ill. 287 (115 N. E. 813); State v. Portage, 174 Wis. 588

(184 N. W. 376); Town of Opp *v.* Donaldson, 230 Ala. 689 (163 So. 332).

In sections 3 and 6 of the statute here under consideration, and perhaps in other portions of it, are provisions which might be taken as an attempt to provide that the undertaking could be financed in whole or *in part* by the proceeds of the revenue certificates. If these provisions should be understood as purporting to authorize the use of *existing* funds or property of the county or the pledge of its *general credit* in any manner in connection with the undertaking, they would seem to be contrary to the stated constitutional limitations as construed in the four last-mentioned decisions by this court and others which might be mentioned, including *City Council of Dawson* v. *Dawson Waterworks Co.,* 106 *Ga.* 696 (32 S. E. 907), and *Renfroe* v. *Atlanta,* 140 *Ga.* 81 (78 S. E. 449, 45 L. R. A. (N. S.) 1173). Be that as it may, these provisions are not so inseparably connected with the general scheme of the act that even if they were stricken the act should, as a result of their invalidity, be held void in its entirety. *Bennett* v. *Wheatley,* 154 *Ga.* 591 (2) (115 S. E. 83). These provisions, whether valid or invalid, do not affect the resolution adopted by the authorities of Cobb County, for the reason that under the terms and conditions of this resolution the undertaking is to be instituted and maintained entirely from the proceeds of the revenue certificates and from the revenues derived from the proposed water system. Compare *Wright* v. *Hardwick,* 152 *Ga.* 302 (109 S. E. 903); *Harrison* v. *Hardman,* 169 *Ga.* 435 (150 S. E. 542). This court has upheld similar acts in reference to drainage and paving enterprises to be financed solely from special assessments. *Almand* v. *Pate,* 143 *Ga.* 711 (5) (85 S. E. 909); *City of Valdosta* v. *Harris,* 156 *Ga.* 490 (5) (119 S. E. 625); *City of Bainbridge* v. *Jester,* 157 *Ga.* 505 (2) (121 S. E. 798). So, in reference to the main features of the resolution, it is our opinion that it does not contemplate the creation of a *debt,* within the meaning of the constitutional limitations upon county indebtedness.

It remains only to consider some of the special or subordinate conditions and stipulations which have been criticized. In section 6 it is declared that "the provisions of this act and of any such resolution . . shall be a contract with every holder of said certificates; and the duties of the municipality and the govern-

ing body and the officers of the municipality under this act and under any such resolution or resolutions shall be enforceable by any certificate-holder by mandamus or other appropriate suit, action, or proceeding at law or in equity." This contract, however, and the prescribed legal remedies for its enforcement, are necessarily subject to the other provisions of the act, from which it appears that the liability of the county must be limited to the special fund created, and that the legal remedies are also limited thereto. The petition alleged that "said resolution provides that the commissioner shall make and fix reasonable and sufficient rates for service rendered by said system and collect therefor, which the said commissioner of roads and revenues of said county is without authority of law to do, and for this reason the proposed action of the defendants is illegal." The contractual duty thus assumed, whether valid or invalid, would not be a debt against the county. An attack upon this provision from another standpoint will be embraced in the discussion in division 2 of this opinion.

The resolution further provides that the county will maintain in good condition and continuously operate "said system" and will charge and collect such rates and tolls "as that the gross revenues will be sufficient at all times to provide for the payment of the operation and maintenance thereof and maintain a depreciation fund and certificate fund as provided herein;" but immediately following this it is stipulated "that nothing contained in this section or elsewhere in said resolution shall be construed to subject the county to any liability to be discharged from any fund or property of the county other than the revenue derived from said waterworks system, nor otherwise to subject the county to any pecuniary liability or to authorize or permit any exercise of the taxing power of the county or to impose or constitute any charge, lien, or encumbrance, legal or equitable, upon any property of the county." There are some decisions to the effect that a promise to maintain rates sufficient to retire the liability would constitute an indebtedness or liability against the county; but an opposite conclusion has been reached by several courts, and the latter we think is the better view. The promise might eventually operate unreasonably on customers (*Washington Water & Electric Co. v. Pope Mfg. Co.*, 176 *Ga.* 155, 167 S. E. 286), but it would not involve the county in any *financial obligation* and would thus not

create a debt, within the purview of the constitution. Oppenheim *v.* Florence, 229 Ala. 60, 155 So. 859; and see editorial discussions with citations in 72 A. L. R. 692, and 96 A. L. R. 1390. The same might be said of other obligations assumed by the county, relating only to performance of duties by the county officials, and not involving financial liability. The plaintiffs are suing only as citizens and taxpayers. Even if some of the proposed acts would be unauthorized, the plaintiffs as citizens and taxpayers would not be entitled to enjoin their performance without showing damage. "A court of equity will not, at the instance of a taxpayer as such, enjoin an ultra vires municipal act the doing of which can in no wise injuriously affect him." *Blanton* v. *Merry,* 116 *Ga.* 288 (42 S. E. 211).

The resolution purports to pledge the gross revenue toward the payment of interest and the creation of a fund for the retirement of principal. It merely assumes, however, that a balance will remain from such gross revenues sufficient to provide for operation and maintenance, including bookkeeping, reports, and other ministerial functions. Even the cost of labor, insurance, depreciation, and repairs are subordinate to the claims of the certificate-holders for payment of principal and interest. There is still, however, no general obligation on the county to meet these expenses; and unless there is a sufficient surplus of revenue to cover these and similar items after payment of principal and interest, the undertaking, as already stated, can only be left to such fate as may result to it from lack of support from the general treasury. If in that event it should fail or go to pieces, the resulting loss can only fall upon the holders of such certificates, the risk being as a matter of law assumed by them under the provisions of the statute and the stipulations of the resolution. Contrast State *v.* State Board of Education, 56 Idaho, 210 (54 Pac. (2d) 141), where existing property was involved.

The resolution also provides that the county shall pay, like other customers, for water and service supplied to it; and it is contended that this provision attempts to create a debt against the county in violation of the constitution. This contention might be well founded if it could be said that the county has in fact promised to patronize the system and to pay for such water or service. While it may be supposed that the county will actually

patronize the system in case of·necessity for so doing, it assumes no obligation in that respect, and it does not even appear that as a corporate entity it is or will ever be in need of such water or service. Here again we touch upon a question about which there is a conflict of authority. But it is our opinion that the provision just referred to does not create a debt within the meaning of the constitution. Decisions on both sides of this question are collated in 96 A. L. R. 1389-90.

In the brief of counsel for the plaintiffs reference is made to the constitutional provision that "municipal corporations shall not incur any debt until provision therefor shall have been made by the municipal government." Code, § 2-5801. This provision was not invoked in the petition; but it would seem that, like those which have been invoked, it is altogether inapplicable unless the contract does purport to create a debt against the county.

From what has been said, it is the opinion of this court that the resolution in question does not impinge upon any of such debt limitations, and that on the question of debt the revenue-certificate act is not unconstitutional for any reason urged, as applied to the instant undertaking.

█ The petition further alleged that this statute is contrary to the constitutional provision that "Protection to person and property is the paramount duty of government, and shall be impartial and complete" (Code, § 2-102), for the reason that the establishment of a water system is not an essential governmental function or one necessary to the protection of persons or property. There is no merit in this contention. A county water system may contribute to the public convenience, health, and general welfare. Compare *Holton* v. *Camilla,* 134 *Ga.* 560 (68 ·S. E. 472, 31 L. R. ·A. (N. S.) 116, 20 Ann. Cas. 199); *McGinnis* v. *McKinnon,* 165 *Ga.* 713 (2-a) (141 S. E. 910); *Swoger* v. *Glynn County,* 179 *Ga.* 768 (177 S. E. 723). The General Assembly had authority under the constitution to extend the power of counties so as to include an undertaking· of this nature, as well as the non-financial obligations about to be assumed in connection therewith. The constitution provides that "each county shall be a body corporate, with such powers and limitations as may be prescribed by law." Code, § 2-8201. It also enumerates several things which counties may not be permitted to do. Code, §§ 2-5401, 2-5402, 2-5501.

None of these provisions, however, would prevent the General Assembly from empowering the several counties to establish water-works systems on the terms and conditions stated in the act of March 31, 1937, as applied to the resolution here under consideration. *Albany Bottling Co.* v. *Watson,* 103 *Ga.* 503, 504 (30 S. E. 270); *Bowers* v. *Hanks,* 152 *Ga.* 659 (111 S. E. 38); *Chamlee* v. *Davis,* 115 *Ga.* 266 (41 S. E. 691); Ga. L. 1901, p. 625, § 12; and see also the provision of the constitution as to general welfare, Code, § 2-1822.

The present case is distinguished by its facts from *Atlanta Chamber of Commerce* v. *McRae,* 174 *Ga.* 590 (163 S. E. 701), involving donation of county funds. The undertaking here is not intended to draw any sum from the county treasury. Neither the revenue-certificate act of March 31, 1937, nor the resolution adopted in pursuance thereof, appears to be invalid for any of the reasons urged by the plaintiffs. Accordingly, the court did not err in denying an injunction.

*Judgment affirmed. All the Justices concur.*