DeJARNETTE *et al.* v. HOSPITAL AUTHORITY OF ALBANY *et al.*

No. 14363.  DECEMBER 3, 1942.  REHEARING DENIED DECEMBER 15, 1942.

194

*Turner L. Smith,* for plaintiffs in error.

*Maston O'Neal, solicitor-general, Leonard Farkas, A. N. Durden, Malone & Peacock,* and *Sumter M. Kelly,* contra.

*Spalding, Sibley, Troutman & Brock, Roberts & Roberts, Ralph H. Pharr, Julius B. McCurdy,* and *Savage, Sterne, Murphy & Hooper,* as amici curiæ.

HEWLETT, Justice. ■ In the intervention it is insisted that the hospital authorities law (Ga. L. 1941, p. 241)' and the contract, as a whole, are void as violative of the constitution of this State, art. 1, sec. 1, par. 2 (Code, § 2-102), providing that "Protection to person and property is the paramount duty of government, and shall be impartial and complete," on the grounds: (a) that the hospital authorities law creates against intervenors and others similarly situated a liability which subjects their property to taxation for the rendering of medical aid and care, and the use of facilities in connection therewith, to a special class of persons as may be certified under the act and the contract by the city and county to the authority, and under the provisions of the act and the contract intervenors must be indigent for them to be able to obtain medical services, aid, and care; and therefore they will be required to use their own moneys for such services, unless they be indigent; whereas indigent persons of the special class above referred to would receive medical aid and care out of tax moneys supplied by intervenors, and for these reasons the act is not impartial and complete in the protection of intervenors and their property, which protection is the paramount duty of government. (b) That while the act sets up a hospital authority to perform a purported governmental function, to which it is proposed the powers therein named shall be delegated, this is not such a governmental function as counties, cities, or other political subdivisions are allowed by law to undertake; and if the county and city are allowed to deal and contract with the hospital authority as a purported governmental agency, then intervenors' property will not

have the protection provided by the constitutional provisions, for the reason that it will be taxed to provide funds for the operation of such alleged and unauthorized governmental function.

In *Williamson* v. *Housing Authority of Augusta*, 186 *Ga.* 673 (199 S. E. 43), the same attack was made upon the housing-authorities law and the housing co-operation law (Ga. L. 1937, p. 697) ; and this court held: "It is no violation of the constitutional guaranty here invoked for the State to provide direct benefits for a certain group, to the exclusion of other citizens, unless done by arbitrary standards. The governing authorities were well justified in limiting to those of moderate income the benefits of the legislation under discussion. The statute makes a classification and states the basis thereof, which can not be said by this court to be unreasonable." In the case of *Aven* v. *Steiner Cancer Hospital Inc.*, 189 *Ga.* 126 (5 S. E. 2d, 356), which was an attack upon a contract between the City of Atlanta and the Steiner Cancer Hospital Inc., in which the city leased to the hospital a tract of land, rent free, in consideration of the hospital treating the poor, this court held: "A contract between a municipality and another corporation for a lease, for a term of thirty-five years, of land owned by the municipality, in consideration of care of the poor of the city by the lessee to the extent of supplying specified medical and surgical treatment in a clinic or hospital existing on such land, is not unlawful as violating any of the provisions of the constitution embodied in the Code, §§ 2-5301, 2-5401, 2-5501, and 2-6401." In the opinion it was said: "It has been held that the furnishing of aid or assistance to the poor is a 'governmental function' (Wood v. Boone County, 153 Iowa, 92, 133 N. W. 377, 39 L. R. A. (N. S.) 168, Ann. Cas. 1913D, 1070), and that questions as 'to what extent, under what circumstances, at what place and *by what agencies* [italics ours] poor persons shall be relieved at the expense of the public, are all purely legislative questions.' Patrick *v.* Baldwin, 109 Wis. 342 (85 N. W. 274, 53 L. R. A. 613, 616). We consider these rulings sound 'and directly in point. . . The governmental functions of a municipality are those conferred or imposed upon it as a local agency, to be exercised not only in the interest of its inhabitants, but in promotion of the public good or welfare, as affecting the public generally. It includes the public peace, health, safety, and morals of the general public, and other

similar public interests. *Love* v. *Atlanta,* 95 *Ga.* 129 (22 S. E. 29, 51 Am. St. R. 64); *City Council of Augusta* v. *Little,* 115 *Ga.* 124 (41 S. E. 238); *Watson* v. *Atlanta,* 136 *Ga.* 370 (71 S. E. 664); *Mayor &c. of Savannah* v. *Jordan,* 142 *Ga.* 409 (83 S. E. 109, L. R. A. 1915C, 741, Ann. Cas. 1916C, 240); *Cornelisen* v. *Atlanta,* 146 *Ga.* 416 (91 S. E. 415); *Mayor &c. of Savannah* v. *Jones,* 149 *Ga.* 139 (2) (99 S. E. 294); *City of Warrenton* v. *Smith,* 149 *Ga.* 567 (101 S. E. 681); *Miller* v. *Macon,* 152 *Ga.* 648 (110 S. E. 873). Care of the poor relates not only to distress of those directly benefited, nor is it a matter of purely local concern. It is a public responsibility, relating to society in general, and may directly affect the peace, health, morals, and security of the public at large. See 21 R. C. L. 713; 43 C. J. 182, § 179."

The legislature of this State in 1792 passed an act to make permanent provision for the poor, which act empowered the justices of the inferior courts in the counties and the overseers of the poor to levy annually a tax not exceeding one fourteenth part of the general tax of each county annually, to take care of its poor. Cobb's Dig. 346. See *Justices* v. *Chapman,* 16 *Ga.* 89 (2), 94; *Waller* v. *Perkins,* 52 *Ga.* 233. In 1808 the legislature passed a statute creating and incorporating the Savannah Poorhouse and Hospital Society, in which appeared the following: "Whereas it appears from the joint memorial of the justices of the Inferior Court of Chatham County and of the Mayor and Aldermen of the City of Savannah that the County of Chatham, containing within its limits a commercial city, much resorted to by the citizens of this State, and adventurers from different parts of the world, is exposed to the burden of those afflicted with poverty, disease, and infirmity, in a much greater degree than the other counties of this State; that no adequate provision has yet been made for their succour and support in times of accident, sickness, and distress; that the said justices and mayor and aldermen aforesaid have united their efforts in commencing an establishment for alleviating the condition of the poor, sick, and infirm, of all descriptions, whom Providence may cast upon their protection. . . And be it further enacted by the authority aforesaid, that in order to aid in promoting a scheme so benevolent and humane, the said poorhouse and hospital society be and they are hereby invested with the use and appropriation of the poor tax of the County of Chatham, and

of the escheated property that may accrue in said county." See Compilations of the Laws of the State of Georgia, by Augustine Smith Clayton, 1812, p. 449. Thus it appears that the legislature of this State has since 1792 recognized the duty of the public to provide for the care of the poor, and since 1808 has delegated the performance of this function to agencies.

The courts have generally held that: "Constitutional provisions authorizing aid to paupers must be given a broad construction consistent with their benevolent purposes." 48 C. J. 432, § 1, and cit. In 21 R. C. L. 701-2-3, § 2, we find the following statements of the general law: "The care of the State for its dependent classes is considered by all enlightened people as a measure of its civilization, and the care of the poor is generally recognized as among the unquestioned objects of public duty; but in spite of this, the duty under the common law was purely moral and not legal. . . The reason for this seeming barbarity of the common law was that matters of charity were thought more appropriate for the church. . . Later, and supposedly about the time of Henry VIII, the law seems to have made paupers a charge on certain municipalities, and now statutes providing for their care out of the public funds are universal. . . The care of the poor is usually delegated by the State in its constitution or by statute to some subdivision thereof, sometimes the county, the township, or other district." In *Love* v. *Atlanta*, 95 *Ga.* 129, 133 (22 S. E. 29, 51 Am. St. R. 64), it was said: "In the discharge of such duties as pertain to the health department of the State, the State is acting strictly in the discharge of one of the functions of government. If the State delegate to a municipal corporation, either by general law or by particular statute, this power, and impose upon it within its limits the duty of taking such steps and such measures as may be necessary to the preservation of the public health, the municipal corporation likewise, in the discharge of such duty, is in the exercise of a purely governmental function, affecting the welfare not only of the citizens resident within its corporation but of the citizens of the commonwealth generally." See *Watson* v. *Atlanta*, 136 *Ga.* 370 (71 S. E. 664).

If the legislature can authorize the delegation of such authority to a city, certainly the people by constitutional amendment can

authorize cities and counties to contract with such agencies to perform such duties.

The purpose of the constitutional provision (Ga. L. 1941, p. 50) and the statute based thereon (Ga. L. 1941, p. 241) was to authorize counties and municipalities to create an organization which could carry out and make more workable the duty which the State owed to its indigent sick; and therefore we should construe both the constitutional amendment of 1941 and the statute most liberally. Under such construction, there is no merit in the contention that the act and contract violate the equal-protection clause of the constitution of this State.

■ In paragraph 4 of the intervention it is insisted section 3 of the hospital-authorities law (Ga. L. 1941, p. 241) is violative of the Georgia Constitution, art. 3, sec. 1, par. 1 (Code, § 2-1201), providing that "The legislative power of the State shall be vested in a General Assembly which shall consist of a Senate and House of Representatives," on the ground that the act, by permitting the governing bodies of a county or municipal corporation to determine when the hospital authority shall function in such county or municipal corporation, in effect permits the county or municipal corporation to create a hospital authority therein, which creation of a hospital authority, if it legally can be done, is a legislative function, and the provision of the act is an attempt on the part of the legislature to delegate its authority, which is inhibited by the constitution. In *Williamson* v. *Housing Authority of Augusta,* supra, this court held a similar provision of the housing-authorities law constitutional. A comparison of these two provisions will show that they are very similar. "Creation of Housing Authorities. In each city (as herein defined) and in each county of the State there is hereby created a public body corporate and politic to be known as the 'Housing Authority' of the city or county; Provided, however, that such authority shall not transact any business or exercise its powers hereunder until or unless the governing body of the city or the county, as the case may be, by proper resolution shall declare at any time hereafter that there is need for an authority to function in such city or county." Ga. L. 1937, pp. 210-214, sec. 4. "There is hereby created in and for each county and municipal corporation of the State a public body corporate and politic to be known as 'The Hospital Authority' of such county or mu-

nicipal corporation, which shall consist of a board of not less than five nor more than nine trustees, to be appointed by a governing body of such county or municipal corporation for such term as may be authorized by the resolution hereinafter provided for. No such authority shall transact any business or exercise any powers hereunder until the governing body of the county or municipal corporation shall, by proper resolution, declare that there is need for an Authority to function in such county or municipal corporation." Ga. L. 1941, pp. 241-242, sec. 3. Substantially the same contentions were made by the plaintiffs in the *Williamson* case as are made in the instant case; and applying the principles announced in that case, section 3 of the act does not violate the above provision of the constitution.

■ In paragraph 5 of the intervention it is insisted that the hospital authorities law (Ga. L. 1941, p. 241) in its entirety, and particularly sections 7, 8, 9, and 12 of the act, is void as violative of the constitution, art. 1, sec. 1, par. 23 (Code, § 2-123), providing: "The legislative, judicial, and executive powers shall forever remain separate and distinct, and no person discharging the duties of one shall at the same time exercise the functions of either of the others," on the ground, as contended, that the act and particularly the above mentioned sections thereof invade the judicial powers as inhibited by the above constitutional provision, for the reason that they provide for the appointment of a receiver, and that his identity shall be confined to a certain class of persons therein designated, which power of appointment of a receiver and the designation thereof is a power reserved to the courts of competent jurisdiction by the constitution. The above act as a whole and the sections referred to do not violate the provision of the constitution which deals with separation of legislative, judicial, and executive powers. See *Lawson* v. *Moultrie,* 194 *Ga.* 699 (22 S. E. 2d, 592).

■ In paragraph 6 of the intervention it is insisted that section 10 of the hospital-authorities law (Ga. L. 1941, p. 241) is void as violative of the constitution, art. 1, sec. 4, par. 1 (Code, § 2-401), providing that "Laws of a general nature shall have uniform operation throughout the State, and no special law shall be enacted in any case for which provision has been made by an existing general law," on the ground that said section authorizes counties in which a hospital authority is functioning to levy an ad valorem tax not

to exceed five mills, exclusive of other taxes that can be levied by said county for hospitalization for the indigent sick, when there is in full force and effect in this State a general law (Ga. L. 1939, p. 200; Code Ann. § 92-3701, par. 17) which authorizes and limits such tax to one mill for such purpose. The hospital-authorities law is general in its terms and has uniform operation throughout the State, applying to each and every county and each and every municipality on the same basis. What the constitution seeks to do is to prevent the creation of special laws giving any one community any more rights or privileges than another, or putting any more duties on one community than any other similarly situated. Both the hospital authorities law and the act of 1939 providing for a one-mill tax for that purpose, are general laws, the only difference being that counties not operating under the hospital-authorities law can only levy a one-mill tax for the purpose of providing medical care and hospitalization for the indigent sick, whereas if they operate under the hospital-authorities law such counties may levy a five-mill tax.

■ Section 10 of the act is not void, as contended in paragraph 7 of the intervention, in so far as the City of Albany is concerned, on the ground that neither the general laws of the State nor the charter of the city authorized the city to levy any tax for the hospitalization of the indigent sick. This is true for the reason that when the constitutional amendment was adopted (Ga. L. 1941, p. 50, 3-c) and the hospital authorities law was enacted (Ga. L. 1941, p. 241, sec. 10) the amendment and the hospital-authorities law became a part of the charter of every municipal corporation of the State that created a hospital authority under the same, and each municipality is now authorized to levy taxes not exceeding five mills, exclusive of all other taxes, to provide medical care and hospitalization for the indigent sick, subject to the debt provision as contained in the constitution, art. 7, sec. 7, par. 1 (Code, § 2-5501), just as if such authority had been contained in its original charter.

■ In paragraph 13 of the intervention it is insisted that the act approved March 27, 1941 (Ga. L. 1941, p. 50), now codified as art. 7, sec. 6, par. 3, of the Georgia constitution (Code Ann. § 2-5403), in enacting and providing for the submission of such constitutional amendment to the vote of the people, is violative of the Georgia Constitution, art. 3, sec. 7, par. 8 (Code, § 2-1808), pro-

viding that: "No law or ordinance shall pass which refers to more than one subject-matter, or contains matter different from what is expressed in the title thereof," on the ground that the proposed constitutional amendment is multifarious, providing for several unrelated matters in the same paragraph or subparagraphs, unrelated to each other, and the body of said act consists of three paragraphs which have no relation one to the other, and contain matter different from that expressed in the title of the act.

The constitutional provision here invoked does not apply to proposals to amend the constitution itself. *Cooney* v. *Foote,* 142 *Ga.* 647 (83 S. E. 537, Ann. Cas. 1916B, 1001); *McCall* v. *Wilkins,* 145 *Ga.* 342 (89 S. E. 219); *Goolsby* v. *Stephens,* 155 *Ga.* 529, 539 (117 S. E. 439); *Madronah Sales Co.* v. *Wilburn,* 180 *Ga.* 837 (3) (181 S. E. 173). Accordingly there is no merit in the contention presented in paragraph 13 of the intervention.

■ In paragraphs 8 and 9 of the intervention it is insisted that the hospital-authorities law (Ga. L. 1941, p. 241) in its entirety, and article 2, paragraph (a) 1, of the contract based thereon, are void as violative of the constitution, art. 7, sec. 7, par. 1 (Code, § 2-5501), on the ground, as contended, that the act provides for the creation of debts, new undertakings, and new liabilities by the city and county in contracts with the authority, and seeks to accomplish indirectly the creation of debts prohibited by the constitution without the prerequisite vote of the citizens and taxpayers. The constitution of 1877 declared in effect that no county or municipality should incur any new debt except for temporary loans to supply casual deficiencies of revenue as therein provided, without the assent of two thirds of the qualified voters of such counties or municipalities voting at an election for that purpose to be held as prescribed by law, and the indebtedness could never under any circumstances exceed seven per cent. of the assessed value of all the taxable property therein. Code, § 2-5501. With the exception of certain specific amendments, such were the limitations applicable to all counties and municipalities at the time of the amendment proposed by the act of March 27, 1941, to authorize "counties and municipal corporations to contract with each other or with public agencies, public corporations or authorities, and to convey existing facilities to any public agencies, public corporations or authorities, and to provide hospitalization facilities." Ga. L. 1941, p. 50;

Code Ann. 1941, § 2-5403. Did this amendment alter such previously existing debt limitation? We think not.

"In the main, the general principles governing the construction of statutes apply also to the construction of the constitution." *Jones* v. *Darby,* 174 *Ga.* 71, 72 (161 S. E. 835); *Blocker* v. *Boswell,* 109 *Ga.* 230, 232 (34 S. E. 289); 11 Am. Jur. 658, § 49; 16 C. J. S. 51, § 15. With respect to statutes, it has been repeatedly held that repeals by implication are not favored, and that a statute will not be so construed as to repeal a previous one, unless the two are so repugnant and irreconcilable that they can not stand together, or the latter one was intended to cover the subject-matter of the other and operate as a substitute for it. *Atlanta Log & Export Co.* v. *Central of Georgia Railway Co.,* 171 *Ga.* 175 (155 S. E. 525); *Cornwell* v. *Atlanta Trust Co.,* 177 *Ga.* 303 (170 S. E. 194). The same rule applies with respect to amendments to the constitution, so that "an earlier provision remains in force in so far as it is not repugnant to an amendment, in the absence of an express repeal; in order to effect a repeal, the repugnance must be so clear and positive that they can not consistently stand together, and, to effect an amendment of an existing provision, the intent to amend, which is to be gathered from the language employed, must be clear and unmistakable." 16 C. J. S. 90, § 42. "The different provisions of the constitution should be harmonized, if practicable. If an amendment duly adopted necessarily conflicts with some previous provision, the amendment, being the last expression of the sovereign will of the people, will prevail as an implied modification pro tanto of the former provision." *Hammond* v. *Clark,* 136 *Ga.* 313 (10 *a*) (71 S. E. 479, 38 L. R. A. (N. S.) 77). While an amendment to the constitution will not be ineffectual or invalid merely because it may differ radically from the existing provisions of that instrument, the amendment will not effect a repeal or change of the original by implication unless it is impossible reasonably to reconcile it. *Stewart* v. *County of Bacon,* 148 *Ga.* 105 (95 S. E. 983); *Clements* v. *Powell,* 155 *Ga.* 278 (116 S. E. 624). "A statute must be construed with reference to the whole system of which it forms a part." *McDougald* v. *Dougherty,* 14 *Ga.* 674 (5). "It is dangerous to imply a legislative intent contrary to previous legislation from doubtful expressions which may admit of different interpretations." *Trustees of First Methodist Episcopal*

*Church* v. *Atlanta,* 76 *Ga.* 181 (3 *b*). In 59 C. J. 1038, § 616, it is stated: "All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it. They are therefore to be construed in connection and in harmony with the existing law, and as a part of a general and uniform system of jurisprudence, and their meaning and effect is to be determined in connection, not only with the common law and the constitution, but also with reference to other statutes and the decisions of the courts." And, as indicated above, the same general principles will apply in construing amendments to the constitution. The amendment here under consideration did not purport anywhere or in any manner to deal with the limitation upon counties and municipalities as to amount of indebtedness, or as to incurring indebtedness without holding an election for that purpose. For this reason the provisions of the amendment and the provisions of the original constitution are entirely consistent; and the amendment did not, under the principles above enunciated, operate to relax in any degree the existing limitation as to such indebtedness, or as to the exclusive manner in which it may be incurred. See in this connection *Downer* v. *Stevens,* 194 *Ga.* 598 (22 S. E. 2d, 139).

It is still more evident that the constitutional amendment here under consideration was not intended to affect the debt clause, when it is observed that this clause is contained in the existing constitution, art. 7, sec. 7, whereas the amendment of 1941 was proposed and ratified *in terms* as an amendment to section 6 of the same article, relating to the powers of counties, and the purposes for which taxes may be levied by them. See paragraphs 1 and 2 of section 6 of article 7 (Code, §§ 2-5401, 2-5402). The amendment merely enlarged the express charter powers of counties and municipalities, and hence related to matters that are entirely different from the subjects dealt with in section 7, to wit, limitations and methods as to the creation of debts. See *Spain* v. *Hall County,* 175 *Ga.* 600 (4-8) (165 S. E. 612) ; *Taylor* v. *Lovett,* 184 *Ga.* 295 (191 S. E. 113).

We thus reach the conclusion that the validity of the statute and the contract, in so far as the creation of a debt is concerned, must be determined by the debt clause as it existed before ratification of this amendment. The question as to the statute therefore is

whether it undertook to authorize counties and municipalities to incur any debt in violation of such debt clause. There is no provision in this act which could reasonably be thought to violate this clause, unless it be section 10, which is challenged by the intervenors. The section is lengthy, and will not be quoted in full. A careful study of its provisions convinces us that it does not undertake to empower counties and municipalities to do anything more than to enter into contracts that fall within the purview of paragraph (c) of the constitutional amendment, consistently with the existing debt clause, and contemplates no contract to pay money in future years in violation of that clause. It expressly declares that "provision shall be made annually by such participating units or political subdivisions contracting with an authority for the payment for the services or facilities of the authority used by the participating units or subdivisions or the residents thereof out of general funds of the participating unit or subdivision or out of tax revenues realized for the purpose of providing medical care or hospitalization for the indigent sick and poor." Next appears a provision authorizing the participating subdivisions to levy an ad valorem tax not exceeding five mills, exclusive of all other taxes, from which there shall be appropriated *annually* sums sufficient to pay for the cost of the use of the services and facilities of authorities by participating subdivisions or the residents thereof pursuant to the contract between such participating units and subdivisions and an authority. Further in the same section it is declared that "sums due and payable under such contract shall be determined from year to year during the period of such contract." In view of these provisions of section 10, the act (Ga. L. 1941, p. 241) appears to *conform* to the limitations of the debt clause of the constitution as construed in previous decisions by this court, rather than to violate it.

It is a well-settled rule of interpretation, that, if a statute is equally susceptible of two constructions, one of which will harmonize it with the constitution and the other of which will render it unconstitutional, the former construction is generally to be preferred. *Fordham* v. *Sikes,* 141 *Ga.* 469 (81 S. E. 208). We conclude therefore that the statute is not unconstitutional as attempting to authorize the creation of a debt in violation of the constitutional provision as expressed in the Code, § 2-5501, and there-

fore that a contract made *in conformity with the statute* would be valid.

But, as stated above, the intervenors also assailed the contract itself, on the ground that it violated the constitutional limitation as to the creation of a debt, to which reference has just been made. This contention appears to have been well taken, and should have been sustained. The contract undertook to bind the county and the municipality *each* to pay to the hospital authority the sum of $100,000 in twenty annual installments of $5000 each, with interest. Under the terms of the contract these promises to pay were made unconditional, and, as indicated above, the payments were to continue for a period of twenty years. Since we have held that the amendment to the constitution did not affect the existing-debt clause, the provisions of the contract for payment of these definite sums annually for a period of twenty years clearly violated the inhibitions of the constitution as to incurring indebtedness without the assent of two thirds of the qualified voters, as expressed in the Code, § 2-5501, although the contract further provided for certain considerations to be furnished to these political subdivisions by the hospital authority in the way of medical service and hospitalization to such of the indigent sick and poor as might be certified by the proper authorities of the county and the city. *City Council of Dawson* v. *Dawson Waterworks Co.,* 106 *Ga.* 696 (32 S. E. 907) ; *Byars* v. *Griffin,* 168 *Ga.* 41 (147 S. E. 66) ; *Douglas* v. *Austin-Western Road Machinery Co.,* 180 *Ga.* 29 (177 S. E. 912) ; *Dortch* v. *Southeastern Fair Association,* 182 *Ga.* 633 (186 S. E. 685) ; *Cartledge* v. *Augusta,* 183 *Ga.* 414 (188 S. E. 675) ; *Wallace & Tiernan Co.* v. *Williams,* 192 *Ga.* 149 (2) (14 S. E. 2d, 747) ; and see especially the constitutional requirement stated in the Code, § 2-5502.

The contract also violated the hospital-authority act itself, which merely authorized annual appropriations by the city and the county of sums sufficient to pay for benefits received by them from the hospital authority, in pursuance of a contract between such participating units and the authority, the sums due and payable under such contract to be "determined from year to year." Ga. L. 1941, pp. 241, 247-8, sec. 10. The statute contained nothing which even tended to authorize a contract by a city and county binding themselves to pay to the hospital authority any sum annually in future

years; and therefore the contract in promising (1) to pay the sums stated, and (2) to levy a tax in future years sufficient to pay the same, exceeded the authority conferred by the statute, and for these additional reasons the contract was invalid, as contended. According to the provisions of the act, the amounts that shall be paid, if anything, for the benefit of the poor and the facilities afforded, shall be determined by the several participating units or political subdivisions "from year to year," for which taxes may then be levied, "not exceeding five mills." It does not appear that the county and the city have already levied taxes, or have in hand available resources sufficient to pay the entire amount stated in the contract; and therefore the case does not fall within the principle ruled in *Johnson* v. *Pinson,* 126 *Ga.* 121 (54 S. E. 922); *Gaines* v. *Dyer,* 128 *Ga.* 585 (7) (58 S. E. 175), and similar cases, to the effect that if taxes are levied or can be legally levied for the year, sufficient to pay for a lawful project, county authorities may contract to pay for it out of such taxes although they may be uncollected. See *King* v. *Casey,* 164 *Ga.* 117 (3), 120-121 (137 S. E. 776).

It is further contended by the objecting taxpayers that the contract violates the Code, § 69-202, declaring that "One council may not by an ordinance bind itself or its successors so as to prevent free legislation in . . municipal government." Since we have held that the contract is invalid as violating the debt clause of the constitution as well as the hospital-authority act itself, and since we are of the further opinion that such a contract would be valid if made in conformity with such statute, we need not pass upon the contention last stated, as to violating the rule against binding future councils. It is sufficient to say that if a contract is made consistently with the debt limitation, and in accordance with the hospital-authority statute, these laws would control, and the rule against binding future councils would not apply.

The contract does not contemplate an exclusively self-liquidating project, as was true in *Miller* v. *Head,* 186 *Ga.* 694 (198 S. E. 680), and *Lawson* v. *Moultrie,* supra.

■ For the reasons indicated in division 7 of the foregoing opinion, the court erred in validating the revenue-anticipation certificates. *Judgment reversed. All the Justices concur.*

JENKINS, Justice, concurring specially. I agree to all that is said

in the first six divisions of the able and well-considered majority opinion. I do not agree to all that is said in the seventh division. It is true, as therein stated, that the general principles governing the construction of statutes apply also to the construction of an amendment to the constitution, and that the different provisions in the constitution should be harmonized if practicable. But, as stated in the majority opinion, "an amendment to the constitution will not be ineffectual or invalid merely because it may differ radically from the existing provisions of that instrument." Where there is a conflict, the last expression of the sovereign will of the people will prevail as an implied modification pro tanto of the former provision. In determining whether or not the amendment to the constitution did in fact alter the law as it existed previously thereto, we must, just as in construing a statute, look diligently for the true intention as expressed by the people, "keeping in view, at all times, the old law, the evil, and the remedy." Code, § 102-102 (9). In construing an amendment to the constitution, the legislative body in proposing it and the people in ratifying it "should always be presumed to mean something by their action," and the amendment as proposed and adopted should not be so construed as to render it "absolutely meaningless." *Central Ry. Co.* v. *State,* 104 *Ga.* 831, 839 (31 S. E. 531, 42 L. R. A. 518); *Board of Tax Assessors of Decatur County* v. *Catledge,* 173 *Ga.* 656 (160 S. E. 909); *Scott* v. *Mount Airy,* 186 *Ga.* 652 (198 S. E. 693).

With these preliminary observations, it will be seen, as set forth in the majority opinion, that before the amendment to the constitution now under review, "no county or municipality [could] incur any new debt, except for temporary loans to supply casual deficiencies of revenue as therein provided," without the assent of two thirds of the qualified voters thereof, voting at an election for that purpose, and provided that said two thirds so voting shall be a majority of the registered voters; "and the indebtedness could never under any circumstances exceed seven per cent. of the assessed value of all the taxable property therein." Code, § 2-5501. The defect or evil that the people sought to correct by the constitutional amendment was that it has obviously proved difficult to engage the interest and attention of a majority of the qualified voters in an election involving matters not of a controversial character; and for this reason the legislature and the people sought to make an

exception to the general rule in so far as the acquisition of hospital facilities for the indigent was concerned. With these defects and purposes in mind, the legislature proposed and the people approved subsection (c) of the constitutional amendment, which provides as follows: "Any city, town, municipality, or county of this State, or any combination of the same, may contract with any public agency, public corporation or authority for the care, maintenance, and hospitalization of its indigent sick, and may as a part of such contract obligate itself to pay for the cost of acquisition, construction, modernization, or repairs of necessary buildings and facilities by such public agency, public corporation or authority, and provide for the payment of such services and the cost to such public agency, public corporation or authority of acquisition, construction, modernization, or repair of buildings and facilities from revenues realized by such city, town, municipality or county from any taxes authorized by the Constitution of this State or revenues derived from any other sources." To the writer it seems to be correctly held by the majority opinion that "the amendment here under consideration did not purport anywhere or in any manner to deal with the limitation upon counties and municipalities as to *amount* [italics mine] of indebtedness." This is true for the reason that while subsection (c) dealt only with the right and power of the county and municipal officials to acquire hospital facilities, and in doing so to obligate themselves by a contractual obligation to pay therefor, it did not take the bridle off as to the amount of indebtedness which they as authorized contractors were permitted to incur; but this subsection of the amendment, thus conferring the right to contract, limited their power in doing so to such obligations as were "authorized by the constitution," that is, within the seven per cent. limitation. It had previously been held in *Miller* v. *Head,* 186 *Ga.* 694, 711 (198 S. E. 680), that county officials might legally issue revenue certificates to be paid solely from revenue derived from the particular enterprise established, and not from taxes. The constitutional amendment now under consideration, while authorizing a valid contract for the payment of money for the acquisition of hospital facilities even "from any taxes authorized by the constitution," did not go further and authorize a contract which would involve the payment of money derived from unauthorized taxes.

I can also see the force of the reasoning in the majority opinion whieh might forbid the making of a contract extending over a term of years, for compensation at a fixed amount for the hospital-ization of indigent persons, since the determination of the varying amounts of service to be rendered and the proper compensation therefor could only await the contingencies of time and tide; but however that might be, the enabling act of the legislature itself specifically requires that provision for such services shall be made *annually* by the municipal or county authorities, and I can see no reason why such a legislative enactment should be taken as repug-nant to the authority conferred by the constitutional amendment.

However, as I construe subsection (c) of the amendment to the constitution, the majority opinion is erroneous in that it inhibits a city or county from contracting through its officials so as "to obligate itself to pay for the cost of acquisition, construction, mod-ernization, or repairs of necessary buildings and facilities" for hos-pitals for the indigent. Such an obligation is not contingent in character like a contract for the treatment of the indigent, or un-certain in amount, but can be definitely determined and assumed.

It is my opinion that subsection (a) of the amendment dispels any doubt which might possibly have existed as to the right of municipal or county officials to contract with any public agency or authority, dealing with *any sort of public activity authorized by law*. To make this wholly clear was the sole purpose of subsection (a). Nothing else is embraced therein; but any contract thus au-thorized by subsection (a) with any public agency or authority having to do with any sort of public welfare enterprise authorized by law must, unlike the provisions of subsection (c), still conform to all the previously existing mandates of the constitution. But when it comes to subsection (c) of the amendment, it deals with hospital authorities and hospital authorities alone. By subsection (c) the city and county officials are not merely authorized to con-tract with hospital authorities in accordance with the previously existing constitutional inhibitions—that express power had already been given by subsection (a); but this particular subsection (c) goes further, *so far as dealing with hospital authorities is con-cerned,* and expressly does that which subsection (a) had failed to do, in that it authorized county and municipal officials to actually enter upon a contract whereby the county or municipality would

be obligated to pay for the acquisition of hospital facilities. The power and authority given to a county or municipality to make a contract is far different from the pre-existing right to submit a contract to the people for their approval, and thereafter consummate it as a formal obligation. In the one case, the power is given to the officials to bind the city or county by their own contractual obligation; whereas in the other case the officials are without power to obligate the city or county except with the aid and express consent of the voters. When this is true, it takes both to create the obligation, and the officials alone are without power to do so. When the legislature saw proper to remove the disabilities of a married woman, and to give the wife power to contract, with certain specific exceptions, all that it did was to say that "the wife may contract." It did not deem it necessary, after having given her this plenary right and power, to go further and say that she could do so without authority obtained from any judge or court, as was necessary under previous law. If subsection (c) does not mean what subsection (c) says, then it is absolutely useless. Under the old law and subsection (a), the officials could have prepared and submitted a contract to the people without the aid of subsection (c). Surely it can not possibly be said that the purpose of subsection (c) was merely to enable county and municipal officials to deal with hospital authorities; for that very thing had already been plainly done by subsection (a). What subsection (c) of the amendment did was to take the acquisition of hospital facilities out from under the general rule laid down in subsection (a), so as to authorize county and city officials, not only to make a contract such as the previous law might have authorized, but to enable the county and municipal officials to "obligate," that is to bind, themselves to pay for such acquisition. This was in addition to any authority given by subsection (a), which merely authorized dealings with such authorities without extending the scope of their contractual authority. It thus appears to the writer that subsection (c) of the constitutional amendment is not meaningless and is not without purpose and effect, but that it does just what by its language it purports to do—that is, it permits county and city officials to obligate themselves to acquire hospital facilities; and that the contract as thus authorized is made valid and binding so long

as the obligation so contracted stays within the seven per cent. limitation which another provision of the constitution has pre-scribed.